IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA       : 1:11CR00127-01

                                  :

        v.                       :

                                  :

SEAN DARNELL JEFFRIES         :

FILED
SEP 23 2015
Clerk U.S. District Court
Greensboro, NC
BY_____

## MEMORANDUM OF LAW SUPPORTING SECTION 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

**Sean Darnell Jeffries** presents the following memorandum of law supporting his motion

to vacate, set aside or correct sentence pursuant to 28 U.S.C. 2255. The motion is based on the

following constitutional violations:

1. The conviction was obtained and/or sentence imposed in violation of the Sixth Amendment to

the Constitution of the United States, specifically, the right to the assistance of counsel and the

right to effective assistance of counsel at all critical stages of the criminal proceedings.[1]

2. 2. The conviction was obtained and/or sentence imposed in violation of the Fifth Amendment

to the Constitution of the United States, specifically the right to due process of law.[2]

---

[1] The Sixth Amendment provides, in pertinent part, as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

[2] The Fifth Amendment provides, in pertinent part, as follows: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law... Article I, Section 9, Clause 3, "No...ex post facto law shall be passed."

arising from a violation of Article I, Section 9, Clause 3 of the Constitution of the United States, hereinafter sometimes called the ex post facto clause.

## I. INCORPORATION BY REFERENCE

The facts set forth in the in the attached 2255 government form are incorporated by reference herewith as if set forth at length hereat.

## II. PROCEDURAL HISTORY

On May 14, 2010, Petitioner was arrested by the Greensboro Police Department ("GSD") and charged with possession with intent to deliver cocaine base in violation of N.C. General Statute 90-95(a), possession of a stolen firearm in violation of N.C. General Stat. 14-71-1 and maintaining a crack house in violation of N.C. General Stat. 90-108(a)(7).

On April 12, 2011, Petitioner pled guilty to these charges in Guilford County Superior Court. Presiding Judge Edgar B. Gregory sentenced Petitioner to 18 months of supervised probation.

On April 25, 2011, a Grand Jury sitting in the Middle District of North Carolina returned an indictment charging Petitioner with possession with intent to deliver ("PWID") cocaine base (crack cocaine) in violation of 21 USC 841(a)(1) and (b)(1)(B) and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 USC 924(c)(1)(A)(i). The charges arose from possession with intent to distribute ("PWID") 11.5 grams of cocaine base, and possession of two firearms in furtherance of the PWID.

On June 1, 2011, the government filed a superseding indictment adding Alton Benn as a defendant and upgrading the charges to include conspiracy to distribute crack cocaine in violation of 21 USC 846 and 21 USC 841(b)(1)(A).

On August 30, 2011, the government filed a second superseding indictment adding Kevin Gordon Heath and Robert Eugene Poole, and charging conspiracy to distribute more than 280 grams of cocaine base (crack) and conspiracy to possess more than 5 kilograms of cocaine hydrochloride (Count One); possession with intent to distribute cocaine base (crack) in an amount less than 28 grams (Count Four); and possession of three firearms, one of which was alleged to be a "street sweeper" in furtherance of a drug trafficking crime (Count Five). The second superseding indictment alleged the conspiracy ended May 31, 2011. [See PSI, page 4, paragraph 3].

On March 5, 2012, following a 12 day jury trial before Judge Thomas D. Schroeder, Petitioner was convicted of the criminal conduct charged in the second superseding indictment.

On September 19, 2012, Judge Schroeder sentenced Petitioner to 300 months' imprisonment on Count One, 240 months' concurrent on Count Four, and 60 months' consecutive on Count Five for a grand total of 360 months. The judgment was filed October 1, 2012. The Probation Department used the 2011 Sentencing Guidelines Manual ("SGM") to calculate the Sentencing Guideline Range ("SGR"). The SGR was calculated as follows: Base Offense Level was 38, based on the conclusion that the criminal conduct involved 8.4 kilograms or more of cocaine base. [USSG 2D1.1(a)(5), (c)(1)]. Adjustments included 3-levels for aggravating role as manager or supervisor (but not an organizer or leader), 2 levels for maintaining a crack house [ USSG 2D1.1(b)(12)] (Paragraph 72 of the PSI) and 2 levels for pattern of criminal conduct engaged in as a livelihood [USSG 2D1.1(b)(14)(E)] (Paragraph 73 of the PSI). The Total Offense Level was 45, which was reduced to 43 pursuant to Chapter 5 of the Sentencing Guidelines Manual. The Criminal History Category was II. The Sentencing Guideline Range was life as to Count One. There was a mandatory consecutive sentence of 60 months as to Count

Five. The district court granted a variance and imposed a sentence of 300 months on Count One; 240 months on Count Four, to be served concurrently; and 60 months on Count Five, to be served consecutively, for a total of 360 months.

On May 21, 2014, the Fourth Circuit Court of Appeals affirmed sub nomine. *United States v. Benn*, 572 Fed. Appx. 167 (4th Cir. 2014). On appeal, Petitioner presented the following issues: (1) the evidence was insufficient to prove conspiracy; (2) the testimony of an unindicted co-defendant who testified pursuant to an immunity agreement was unreliable; the government's expert was neither timely noticed nor qualified; the sentence imposed violated *Alleyne v. United States*, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013).

On October 5, 2014, the United States Supreme Court denied the petition for writ of certiorari. *Jeffries v. United States*, 135 S.Ct. 313, 190 L.Ed.2d 227 (10/6/14)

## III. SUMMARY OF THE FACTS IN THE LIGHT MOST FAVORABLE TO THE GOVERNMENT AS SET FORTH IN THE APPELLATE OPINION

In 2007, the Greensboro Police Department ("GPD") began an investigation into a crack cocaine conspiracy in Greensboro, North Carolina. The conspiracy was believed to be run by the "Bundy Boys." GPD Narcotics Officer R.L. Alston began investigating Alton Benn (a.k.a. "Bundy" or "B"), the alleged leader of the Bundy Boys. Alston learned that Alton Benn, Leonard Gary Williams (a.k.a. "G"), Robert Poole (a.k.a. "Pooh"), Sean Jeffries (a.k.a. "Fuzz"), and Kevin Haith (a.k.a. "Smoke") were involved in the distribution of crack cocaine.

Officer Alston conducted surveillance at Alton Benn's residence. He saw people coming and going on a regular basis. On May 24, 2007, Officer Alston conducted a trash pull at Alton Benn's residence and found a wrapper normally used to wrap kilograms of cocaine. After field-testing, it was revealed that the wrapper contained Alton Benn's left palm print, and the residue on the wrapper tested positive for powder cocaine. On August 30, 2007, Officer Alston

conducted another trash pull at the house, and found a white powdery substance inside a trash bag. That substance also field-tested positive for cocaine. Officer Alston continued periodic surveillance of Alton Benn's house from 2007-09. During this time, the GPD conducted searches, and sometimes arrests, at around a dozen other residences in Greensboro, each of which had some link to the Bundy Boys.

At trial, Tashee Mumford and Leonard Williams explained how they came to know the "Bundy Boys" and the inner-workings of the organization.

A. Tashee Mumford's Testimony

According to Mumford, Kevin Haith introduced her to Leonard Williams and Alton Benn, who introduced her to Sean Jeffries. She identified Williams, Benn and Jeffries as the "Bundy Boys." She also testified that Poole would "keep [the drugs] at his house, or whatever location he was in, for the next time somebody needs some."

During her association with the Bundy Boys, Mumford sold crack cocaine from a house on Bragg Street in Greensboro with Mr. Haith, and those drugs were brought there by Alton Benn or Leonard Williams. She said that after the drugs were sold, she or Haith would give the money to Benn. She and Haith also sold crack from a house on Charlotte Street. Later, Mumford moved away from Haith and started selling drugs from an apartment on Waugh Street. She explained that at that time, Williams, Benn and Jeffries were on "the same team."

Mumford described the structure of the Bundy Boys as follows: Bundy [Alton Benn] would be first, or the head, person and then you have G [Williams] under him. Then you have, like, maybe Fuzz [Jeffries] under G, and then you will have all other workers or the people that was under them . . . who would run the houses, and then you would have us, the workers, that are in the house.

Mumford explained that if Benn could not bring drugs, Williams would, and when he could not, Jeffries would. She said sometimes Jeffries would "run a house." According to Mumford, after Williams was arrested, as explained below, Jeffries took over for Williams.

B. Leonard Gary Williams's Testimony

In April, 2009, GPD officers raided his house on Oak Street and found crack cocaine and a .380 handgun. Benn bonded him out. Williams continued to sell drugs to pay for his lawyer. He sold crack until he was again arrested in February 2010 by Officer Alston. After this arrest, he agreed to cooperate with federal agents in exchange for immunity.

Williams met Benn in Connecticut 20 years ago, and the two men moved to North Carolina together around 1996. He met Haith in North Carolina in 1996. He met Jeffries and Poole in North Carolina around 2004. From 2006 to his arrest in 2010, Williams' main source of income was selling crack cocaine. He and Benn would travel to purchase powder cocaine, which Benn would cook it into crack cocaine.

Williams testified that the crack cooked by Benn would be sold at Pearson Street, Holt Street, McConnell Road, Bragg Street, Charlotte Street, Winston Street, and Duke Street in Greensboro. He testified that Poole "might sell very little, but he would be the doorman sometime, and he will either ride with me or Mr. Benn and hold the drugs while they were delivered . . . [j]ust in case the police stopped, he would be the one who [would] take the charge or either run with it."

As to the organizational structure of the Bundy Boys, Williams testified, "[W]hen I first came, I had to work my way up. I ain't just start becoming the one who delivered the drugs. I had to work the window, watch out for the police. I had to sell the crack cocaine, and then I move up into the one that would help bag up the crack cocaine and deliver it. . . . It was

like Mr. Benn was the president, I was the vice president, and everybody else was like the workers. . . . Sometime [the workers] would switch up from selling to watching the window or the door. That's about it. Williams explained that he stopped being the "vice president" sometime in 2008. At that time, "Mr. Benn and Mr. Jeffries became more closer than me and Mr. Benn."

According to Williams, Benn made powder cocaine purchases in Asheboro, Winston-Salem, and Atlanta. He and Benn made four trips to Asheboro; and he and Benn, Jeffries, and Poole made three to four trips to Winston-Salem, each time to buy powder cocaine. Once they were back in Greensboro, they would cook the powder at either Benn's, Jeffries's, or Williams' residence, and it would be bagged for storage. Many times, Williams would deliver the drugs to Greensboro crack houses, collect the money and bring it to Benn. He explained that the crack houses ran day and night, seven days a week.

Williams testified that around 2007-08, he went to Atlanta three times to buy powder cocaine. The first time, he went with Benn, Jeffries, and Poole; a worker named Helen Grier; and two other individuals. Their intention was to bring back three kilograms of powder cocaine. Williams, Benn, Jeffries, and others contributed money to make this purchase, but they only ended up with one "good" kilogram. Thus, they returned to Atlanta, bought more powder cocaine, sold it in Greensboro, and obtained the proper amount to pay back those who had contributed money.

On one occasion in 2008, Williams did not make the trip to Georgia, but Benn told him about it. During that trip, law enforcement stopped the vehicle in which Benn, Jeffries, and Poole, Grier, and Barry Shamel were traveling. Williams explained,

> They went to purchase 8 kilos of cocaine; and after purchasing the 8 kilos of cocaine, . . . they was followed by some police in pick-up trucks. It turned into a high-speed chase and Mr. Benn got distant enough from the police. . . . Shamel jumped out with the black duffel bag with the 8 kilos of cocaine in it and went and buried them . . . [t]hen after that,

the police closed in on Mr. Benn and Mr. Jeffries and Miss Grier, and they took Mr. Benn to jail for questioning. . . . Poole got out [of the vehicle] a little bit farther after [Shamel] got out[.]

Grier testified that when Poole jumped out of the vehicle after Shamel, he carried a backpack full of materials used to cook crack. At Benn's direction, Williams wired $100 so that Shamel could get a hotel room after he buried the drugs. Once everyone returned to Greensboro, they took the eight kilograms of powder cocaine and buried it near Benn's residence. The next day, Benn cooked the powder cocaine into crack cocaine.

Later in 2008, Benn and Jeffries, along with a third man, made a trip to Texas to purchase two kilograms of powder cocaine. Benn called Williams and told him he had been stopped by the police, who took their money as soon as they crossed into Texas. Major Wade Robinson of the City of Orange Police Department in Texas performed a search of the vehicle and found $50,000 in cash in a black bag. DEA Special Agent Timothy Duriso testified that Jeffries claimed the money was his, but he was unable to explain the source of the cash. Williams had earlier testified that the money was going to be used to purchase two kilograms of powder cocaine.

In addition, GPD Detective Eric Goodykoontz testified that on May 20, 2009, police stopped a vehicle driven by Benn on English Road, near Phillips Avenue in Greensboro. Benn was with Poole. Poole was searched, and officers discovered scales and a glass smoking device in his shirt pocket. Upon further searching, officers discovered that Poole was hiding 1/2 ounce, or 14 grams, of crack cocaine in his buttocks.

## IV. TIMELINESS OF 2255 MOTION

28 U.S.C. 2255 reads, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established
> by Act of Congress claiming the right to be released upon the
> ground that the sentence was imposed in violation of the Constitution
> or laws of the United States, or that the court was without

jurisdiction to impose such sentence, or that the sentence was
in excess of the maximum authorized by law, or is otherwise
subject to collateral attack, may move the court, which imposed
the sentence to vacate, set aside, or correct the sentence.

Unless the motion, and the files, and the records of the case
conclusively show that the prisoner is entitled to no relief, the
court shall cause notice thereof to be served upon the United States
attorney, grant a prompt hearing thereon, determine the issues, and
make findings of fact and conclusions of law with respect thereto.
If the court finds that the judgment was rendered without jurisdiction, or
that the sentence imposed was not authorized by law or otherwise
open to collateral attack, or that there has been such a denial or infringement of
the constitutional rights of the prisoner as to render
the judgment vulnerable to collateral attack, the court shall vacate and
set the judgment aside and shall discharge the prisoner or resentence him
or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring
the production of the prisoner at the hearing.

An appeal may be taken to the court of appeals from the order entered
on the motion as from a final judgment on application for a writ of habeas corpus.

An application for a writ of habeas corpus in behalf of a prisoner who is
authorized to apply for relief by motion pursuant to this section, shall not
be entertained if it appears that the applicant has failed to apply for relief,
by motion, to the court which sentenced him, or that such court has denied
him relief, unless it also appears that the remedy by motion is inadequate
or ineffective to test the legality of his detention.

A 1-year period of limitation shall apply to a motion under this section. The
limitation period shall run from the latest of--

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by
governmental action in violation of the Constitution or laws of the United States
is removed, if the movant was prevented from making a motion by such
governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme
Court if that right has been newly recognized by the Supreme Court and made
retroactively applicable to cases on collateral review;

(4) the date on which the facts supporting the claim or claims could have been discovered through the exercise of due diligence.

On October 6, 2014, the United States Supreme Court denied the petition for certiorari. The conviction became final on that date. *Clay v. United States,* 537 U.S. 522, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003). The deadline for filing the 2255 motion is **October 5, 2015**. The instant motion is "timely."

## V. GROUND ONE: THE CONVICTION WAS OBTAINED AND SENTENCE IMPOSED IN VIOLATION OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT ALL CRITICAL STAGES GUARANTEED BY THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

### A. GENERAL PRINCIPLES

*Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984)["Strickland"] established the two-pronged-test for evaluating claims of ineffective assistance based on inadequate legal assistance. *Strickland* states, "[t]he question is whether an attorney's representation amounted to incompetence under **'prevailing professional norms,'** not whether it deviated from best practices or most common custom." (quoting *Strickland*, 466 U.S. at 690).

Prevailing professional norms include the ABA Standards for Criminal Justice, Standard 4-5.2, Control and Direction of the Case,[3] which provides:

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and **others are ultimately for defense counsel. The decisions which are to be made by the accused after <u>full consultation</u>** with counsel include:

---

[3] *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)(finding ABA standards useful guides to determining what is reasonable" quoting *Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527).

**(i) what pleas to enter;**

**(ii) whether to accept a plea agreement;**

(iii) whether to waive jury trial;

(iv) whether to testify in his own behalf;

(v) whether to appeal

The comment to this section reads, in pertinent part, as follows:

In making these decisions--whether to plead guilty, whether to waive jury trial and whether to testify--the accused should have the **full and careful advice of his lawyer**. Although counsel should not demand that his own view of the desirable course be followed, he is free to engage in fair persuasion.

(2) *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 322 (1948), which states:

Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and **then offer his informed opinion as to what plea should be entered.**

(3) *Lafler v. Cooper*, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012) explains that the plea bargaining process is a separate and distinct critical stage, and that the elements of a claim of ineffective assistance of counsel during plea bargaining include (a) the petitioner's self-serving statement that he would have accepted the plea offer but for trial counsel's deficient performance; and (b) objective evidence which could be a large difference between the sentence imposed after trial and the sentence that would have been imposed under the plea offer. It also states that a fair trial does not cure ineffective assistance of counsel at plea bargaining.

Besides prevailing professional norms, and the aforementioned Supreme Court decisions, there is a significant body of federal case law which evolved over the years giving content to and defining the phrase "prevailing professional norms" in the context of plea bargaining.

For example, ***Roccisano v. Menifee***, 293 F3d 51, 59-60 (2d Cir. 2002) states: the "client is entitled to advice of counsel concerning all aspects of the case, including a candid estimate of the probable outcome...the probable outcome of alternative choices...the maximum and minimum sentences that can be imposed...and when possible, what sentence is likely." ***Roccisano*** states that the principles articulated in the preceding quotation date back fifty plus years to ***Von Moltke v. Gillies***, 332 U.S. 708, 721, 68 S.Ct. 618, 92 L.Ed. 309 (1948), ***United States v. Day***, 969 F2d 39 (3d Cir. 1992), ***Cullen v. United States***, 194 F3d 401 (2d Cir. 1999), ***United States v. Carmichael***, 216 F3d 224 (2d Cir. 2000), ***Magana v. Hofbauer,*** 263 F3d 542 (6th Cir. 2001), ***Paters vs. United States,*** 159 F3d 1043 (7th Cir. 1998), ***Julian v. Bartley***, 495 F3d 487 (7th Cir. 2007), ***Milton v. Miller***, 744 F3d 660 (10th Cir. 2014).

This body of law was reviewed, approved and adopted in ***Lafler v. Cooper***, 132 S.Ct. 1376, 1385-86, 182 L.Ed.2d 398  (2012) and ***Missouri v. Frye,*** 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012), which are retroactive as applications of ***Von Molkte*** and ***Strickland***. See ***In re Williams***, 2012 U.S. App. Lexis 24166 (3d Cir. 2012), ***Yates v. Aiken***, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988).

## B. INEFFECTIVE ASSISTANCE DURING THE PLEA BARGAINING PROCESS

On April 25, 2011, A Grand Jury sitting in the Middle District of North Carolina returned an indictment charging Petitioner with possession with intent to deliver crack cocaine in violation of 21 USC 841(a)(1) and (b)(1)(B) and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 USC 924(c)(1)(A)(i).

On April 27, 2011, William Trivette, Esq., the Federal Public Defender, was appointed. On May 2, 2011, Petitioner appeared for a detention hearing. It was during this period that Mr.

Trivette informed Petitioner that the government was extending a plea offer consisting of consecutive terms of five (5) years on Count One and five (5) years on Count Two.

On May 1, 2011, William Trivette, Esq., the Federal Public Defender, handed Petitioner a sheet listing the minimum and maximum sentences that applied to Count One (PWID) and Count Two (Possession of a Firearm). Petitioner informed Mr. Trivette that he wanted to accept the plea offer because he "just wanted to out this whole ordeal behind me like I did with the North Carolina state case." Nevertheless, Mr. Trivette failed to present Petitioner's acceptance of the plea offer in a timely manner. As a result, the plea offer lapsed.

On May 31, 2011, the government filed a superseding indictment upgrading the drug amount from 11.5 grams of crack cocaine to 280 grams of crack cocaine. The firearms' offense also was upgraded to include a "Street Sweeper" which carried a sentence of 30 years. Plainly, Petitioner suffered prejudice when Mr. Trivette did not convey Petitioner's acceptance of the plea offer to the ten year maximum, and instead let the offer lapse. The attorney's conduct fell below professional norms. The attorney should have conveyed acceptance of the offer to the prosecutor. The failure to convey the acceptance in a timely manner was deficient performance. The prejudice is the difference between ten (10) years under the initial plea offer and the 360 month sentence imposed after trial.

On May 24, 2011, as a result of frustration over Mr. Trivette's failure to communicate Petitioner's acceptance of the ten year plea offer, Petitioner's family hired Attorney Patrick Roberts, who informed Petitioner that there was a new, less-favorable plea offer. Under the new plea offer, Petitioner would be sentenced to 10 years for the drug crime, and five (5) years for the weapon for a maximum sentence of 15 years. Mr. Roberts explained that under the Sentencing

Guidelines, the Criminal History Category would be II, and the Offense Severity would be 32. The Sentencing Guideline Range would be 135-168 plus 60 months for the gun.

There were plea negotiations between Mr. Roberts and the prosecutor. Defense counsel was out of the country during the week of July 11, 2011.

On July 20, 2011, the government's attorney filed a motion for extension of time for filing responses to various defense motions. Defense counsel and counsel for the government were negotiating a plea agreement. Petitioner understood that there were plea negotiations on or about July 19, 2011. The final answer on the outcome of plea negotiations was due July 25, 2011. Petitioner was not informed of the outcome of the negotiations.

Petitioner had no knowledge whether the government made any plea offers after that .

Petitioner did not want a trial. He wanted to accept a plea offer. He wanted to put the entire matter behind him, and get on with his life.

Mr. Roberts was constitutionally ineffective for failing to convey all plea offers to the Petitioner. The decision to accept or reject the plea offer belonged to Petitioner, but Petitioner could not accept an offer he did not know about.

The prejudice is the difference between the sentence imposed (360 months) and the ten year sentence that would have been imposed had counsel conveyed all plea offers.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

A criminal defendant is entitled to effective assistance of counsel at sentencing. ***Burger v. Kemp***, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), ***Gray v. Branker***, 529 F3d 220 (4th Cir. 2008).

The Guidelines are advisory but they continue to play a crucial role in sentencing procedures, both at the district court level and when sentences are reviewed on appeal. First, "a

district court should begin all sentencing proceedings by correctly calculating the applicable Sentencing Guideline Range. As a matter of administration and to secure nationwide consistency, the Guideline Range should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The district court must then consider the arguments of the parties and the factors set forth in 18 USC 3553(a). The district court "may not presume that the Guidelines range is reasonable," Id. at 50, 128 S.Ct. 586, 169 L.Ed.2d 445; and it "may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views," *Pepper v. United States*, 562 U.S. ___, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196, 220 (2011) (citing *Kimbrough v. United States*, 552 U.S. 85, 109, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). The district court must explain the basis for its chosen sentence on the record. Gall, 552 U.S. at 50, 128 S.Ct. at 586, 169 L.Ed.2d 445. "[A] major departure [from the Guidelines] should be supported by a more significant justification than a minor one." *Ibid.* Overall, this system "requires a court to give respectful consideration to the Guidelines," but it "permits the court to tailor the sentence in light of other statutory concerns as well." Id. at 101, 128 S.Ct. 558, 169 L.Ed.2d 481.

*United States v. Lewis*, 606 F3d 193 (4th Cir. 2010) held that the district court should apply the SGM in effect at the time of sentencing unless it violates the ex post facto clause of the United States Constitution.

*Peugh v. United States*, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013) held that the ex post facto clause. (Article I, Section 9, Clause 3) applies to the Sentencing Guidelines Computation despite the district court's sentencing discretion because the guidelines are the benchmark for imposition of the sentence.

Effective November 1, 2010, the Sentencing Guidelines increased the penalties for drug crimes. November 1, 2010 was six months after Petitioner's criminal conduct terminated with his arrest by North Carolina authorities.

Application of the 2011 SGM in effect on the date of sentencing violated the ex post facto clause. The lawyers were ineffective for failing to make appropriate and timely objections.

To be sure, the second superseding indictment alleged that the conspiracy ended May 31, 2011. However, the indictment does not determine the termination date of a conspiracy. *United States v. Blackshire*, 538 F2d 569 (4th Cir. 1976), *United States v. Abuelhava*, 911 F2d 725 (4th Cir. 1990). The facts of the case dictate the termination date of the conspiracy.

Here, the Petitioner's participation in a conspiracy is presumed to continue absent some intervening event, but Petitioner was arrested May 14, 2010 by North Carolina authorities, and the arrest terminated Petitioner's participation in the conspiracy. There is not only no evidence in the PSI indicating the Petitioner's criminal conduct continued past November 1, 2010. There is no evidence in the PSI which indicates the conspiracy continued past November 1, 2010.

The Probation Officer used the 2011 SGM to compute the Total Offense Level. The Probation Officer should have used the 2009 SGM.

As a result of the mistake, Petitioner's Total Offense Level increased +2 Levels for "pattern of criminal conduct" and a +2 Levels for maintaining a premises for manufacturing or distributing a controlled substance. The 2009 SGM did not include these two enhancements.

By using the 2011 Manual, the Probation Officer inflated the Total Offense Level by +4. The District Court adopted the Probation Officer's Guidelines Computation. [Sentencing Transcript at page 41]. The adoption of the PSI without change violated the ex post facto clause and due process.

In addition, the Criminal History Category should have been I and not II because there was no evidence that Petitioner was serving a term of unsupervised release during the time of his involvement in the conspiracy.

Sentencing counsel's performance was objectively deficient for failing to raise the ex post facto issue at sentencing. There was no strategic reason for failing to raise this issue.

If the ex post facto issue had been raised at sentencing, there was a reasonable probability the sentence would have been lower than 360 months.

To be sure, the district court exercised discretion and granted a variance from Level 45, but that does not cure the prejudice from the failure to object to the ex post facto violation. The assumption is that the sentence goes up and down with the Sentencing Guidelines Computation. As such, there was a reasonable probability the district court would have imposed a lower sentence if the ex post facto violation had been brought to the district court's attention lowering the Total Offense Level from 45 to 41.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

The United States Supreme Court has recognized that appellate practice is governed by a set of rules and requires a set of skills unfamiliar to most lay people. *Evitts v. Lucy*, 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 830 (1985). A criminal appellant requires, and is constitutionally entitled to "careful advocacy to ensure that rights are not foregone and that substantial legal and factual arguments are not inadvertently passed over." *Penson v. Ohio*, 488 U.S. 75, 85, 109 S.Ct. 346, 352, 102 L.Ed.2d 300, 311 (1988)

The facts and legal principles set forth in Section C are incorporated herewith as if set forth at length hereat.

## SWORN AFFIDAVIT

 

I Sean Jeffries hereby states under the penalty of perjury, that the following facts are based upon information and belief and facts I believe to be true.

1. That on or about April 27, 2011, I was appointed Defense Counsel William S. Trivette to represent me.

2. That during a hearing held on May 2, 2011, while in Court for a detention hearing, Mr. Trivette advised me that the government was extending me a plea offer for Five Years on Count One and Five Years on Count Two. I was then handed the a Sentencing Exposure letter that was back dated May 1, 2011. After I reviewed it, I made an inquiry to Mr. Trivette as to whether the five-years would run concurrently. I was informed No and made a notation indicating "consecututive" on the Sentencing Exposure letter. I informed counsel Trivette that I would take the plea and put this whole ordeal behind me like I did with my just recently imposed North Carolina State charges.

3. That Mr. Trivette never notified the government that I was accepting the plea in a timely manner and that plea lapsed on May 31, 2011. My charges were Superseded with a harsher drug quantity and weapons.

4. That as a result of Mr. Trivette's deficient performance by

not relaying my plea acceptance to the government, which caused me prejudice as a result the harsher penalties handed down in the Superseding Indictment. My family went and hired another attorney, Mr. Patrick Roberts.

5. That during my first few initial meetings with Mr. Roberts, he informed me that I am now looking at a mandatory minimum term of 10 to Life because my initial drug quantity was raised to 280 grams or more and that any sentence imposed for the weapons would run consecutive for a total of 15 years.

6. I informed Mr. Roberts that I do not wish to go to trial because there is no question about my guilt for my prior State Drug Case and it's listed as a overt act for the jury to prove and the gun charges. I informed counsel Roberts that I'll accept the 15 year plea offer.

7. That Counsel Roberts stated that he will relay my acceptance to the prosecution and everything will be taken care of before he leaves to go out of the Country.

8. That when Mr. Roberts returned from his trip, he never notified me as to what if anything occurred with my acceptance of the plea. He filed a motion for a severance and discovery. I later found out that he was also in negotiations with government on July 19, 2011, but I was never informed of those results.

9. That to this day, I don not know why Mr. Roberts has never relayed my wishes to plead guilty to the prosecution before my

Indictment was again Superseded on August 30, 2011. I do not know whether there were other plea's on the table thereafter all's I recall is that I was set to go to trial on the harsher charges soon thereafter.


DATED: AUGUST 17, 2015,
       FAIRTON, NEW JERSEY


SWORN TO BEFORE ME THIS _18th_          Respectfully Submitted,
DAY OF AUGUST 2015.

_Mari Lafferty_                          SEAN JEFFRIES.
PUBLIC NOTARY SIGNATURE.


**MARIA LAFFERTY**
**NOTARY PUBLIC OF NEW JERSEY**
**My Commission Expires 5/30/2018**

# DECLARATION

The undersigned declares, under penalties of perjury, pursuant to 28 U.S.C. 1746

that the following information is true and correct:

1. I am the moving party in the attached 2255 motion and supporting

memorandum of law;

2. I have read the 2255 motion and the memorandum of law.

3. I understand the facts and I understand the legal issues set forth in the 2255 motion and

the memorandum of law, and I adopt those statements of facts and legal issues as if I had

prepared the documents myself.


Date: 9/15/15

Sean Jeffries